DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

The Huntington National Bank,      )
                                   )   CASE NO.     5:09 CV 2468
            Plaintiff,             )
                                   )
      v.                           )
                                   )   MEMORANDUM OPINION
United States of America, et al.,  )
                                   )
            Defendants.            )
                                   )

On October 22, 2009, Plaintiff The Huntington National Bank, successor by its merger

with Sky Bank, successor by its merger with The Second National Bank of Warren

("Huntington") filed a Complaint (ECF 1) for wrongful levy against the defendant United States

of America ("the Government" or "the IRS") pursuant to 26 U.S.C. § 7426 as to a certain stock

account ("the Stock Account") maintained by the defendant UBS Financial Services Inc.

("UBS") and a certain life insurance policy ("the Life Insurance Policy") issued by the defendant

The Hartford Life Insurance Company ("Hartford").  The IRS levied against the Stock Account

and the cash surrender value of the Life Insurance Policy, on the grounds that both of those

assets are owned by a delinquent taxpayer, the defendant Richard W. Varner ("Mr. Varner").

Also named as a defendant is the Richard Varner Revocable Trust Dated July 9, 2002 ("the

Trust").

Huntington claims to have valid and subsisting first priority-interest liens on both the

Stock Account and the Life Insurance Policy.  Huntington also claims that the Life Insurance

Policy is not owned by the Taxpayer Mr. Varner but is instead owned by his Trust.  Huntington

(5:09 CV 2468)

seeks an order of wrongful levy; a declaratory judgment declaring the rights, duties, or

obligations with respect to the Parties in the Stock Account and Life Insurance; and an order

enjoining the IRS from enforcing the levies.

On October 30, 2009, the Court entered a temporary restraining order (ECF 21) which

remains in effect pending the Court's ruling upon Huntington's Motion for Preliminary

Injunction (ECF 3) which is presently at issue before the Court, the Court having conducted a

hearing on the Motion (*See* ECF 34, Transcript of Preliminary Injunction Hearing) and the

parties (Huntington and the IRS) having filed pre-hearing and post-hearing briefs supporting

their respective positions.  *See* ECF 28, 30, 35 and 37.

For the reasons that follow, the Motion for Preliminary Injunction (ECF 3) is sustained.

## I.  Factual Background

The material facts are not in dispute and, except for the subject Trust instrument, all the

relevant documents have been provided for the Court's review.  The Court believes that the facts

can most lucidly be set forth in chronological order as follows.

1.      July 19, 2002:

      Hartford issued a $3,000,000.00 Life Insurance Policy insuring the life of Rick W.
Varner.  The Policy Specifications page sets forth the Owner and the Beneficiary of the
Policy as the "R VARNER REV TST DTD 7/9/02."  The terms of the Policy provide that
the Owner may assign the Policy. *See* ECF 37-1 at pages 5, 24, and 32 of 35.

2.      April 25, 2003:

      a.      In return for a loan of money, Taxpayer Mr. Varner, in his individual capacity,
executed and delivered to Second National Bank of Warren ("Second National"), its
successors and assigns, a cognovit promissory note in the principal amount of
$2,000,000.00 together with interest thereon ("Note 1").  *See* Complaint (ECF 1),
Exhibit C.

2

(5:09 CV 2468)

b.  As security for the debt evidenced by Note 1, Mr. Varner, in his capacity as Trustee of the Richard Varner Revocable Trust dated 07/09/02 ("the Trust"), executed a document entitled "Assignment of Life Insurance Policy as Collateral" (the "Assignment").  ECF 1, Exhibit F.  By this Assignment, Mr. Varner as Trustee "collaterally" assigned to Second National, its successors and assigns, Hartford Life Insurance Policy No. VL9326636 insuring the life of Richard W. Varner for $2,000,000.00 [1], "and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof) . . . ."  Assignment at ¶ A.

Paragraph B of the Assignment enumerated certain "specific rights" included in the Assignment such as the sole right to collect the net proceeds upon death of the insured; the sole right to surrender the Policy, etc.

Paragraph C of the Assignment enumerated certain "specific rights" reserved by Mr. Varner such as the right to designate and change the beneficiary.

The Assignment provided that it "is made and the Policy is to be held as collateral security for any and all present and future liabilities of [Richard W. Varner] . . . to the Assignee . . . ."  Assignment at ¶ D.

The Assignment provided that the Assignee was not obliged to pay any Policy premiums.  Assignment at ¶ G.

At ¶ E of the Assignment, the Assignee agreed as follows:

1.  That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities [of Mr. Varner], matured or unmatured, shall be paid by the Assignee to the persons who would have been entitled thereto under the terms of the Policy had this assignment not been executed;

2.  That the Assignee will not exercise . . . the right to surrender the Policy . . . until there has been default in any of [Mr. Varner's] Liabilities or a failure to pay any premium when due . . . .

---

[1]  The Policy actually provides insurance in the amount of $3,000,000.00 instead of the $2,000,000.00 amount recited in the Assignment.  Also, although Huntington, in its Complaint (ECF 1) at ¶ 15, alleged that the Policy was owned by Mr. Varner, Huntington has since taken the position (and Hartford has concurred) that the Policy is owned by Mr. Varner's Trust – a point which the IRS disputes based upon an *alter ego* theory.  *See* further discussion below.

3

(5:09 CV 2468)

> At the bottom of page 2 of the Assignment, there appears a provision entitled "RELEASE OF ASSIGNMENT OF LIFE INSURANCE POLICY," which states:
>
>> For Value Received, all right, title and interest of the undersigned assignee (The Second National Bank of Warren) in and to Life Insurance Policy Number VL9326636 issued by Hartford Life Insurance on the life of Richard W. Varner is hereby relinquished and released.
>
> Below the above quoted Release provision, there appears a blank signature line for an authorized representative of the Assignee bank to sign the Release upon Mr. Varner's repayment of his debt.

3.  July 1, 2004:

Second National was merged out of existence into Sky Bank.  *See* ECF 1, Exhibit B.

4.  Sometime between July 1, 2004 and November 25, 2005:

Mr. Varner defaulted on his payments on Note 1.

5.  November 25, 2005:

a.  Note 1 being in default, the balance of the subject debt was refinanced and rolled into a second cognovit promissory note for $1,100,000.00 ("Note 2").  *See* ECF 1, Exhibit D.  Note 2 was executed by Mr. Varner in his individual capacity and was made payable to Sky Bank, it successors and assigns ("Lender").

b.  To secure payment of the debt evidenced by Note 2, Mr. Varner executed and delivered to Lender a Commercial Pledge Agreement granting Lender a security interest in a certain stock investment account known as the McDonald Financial Group Stock Account No. 8858XXXX ("the Stock Account").  *See* ECF 1, Exhibit H.  The Commercial Pledge Agreement gave Lender, among other things, the right to maintain and protect the Stock Account and the right to receive all income and proceeds from the Stock Account.

c.  Pursuant to the terms of the Commercial Pledge Agreement, Mr. Varner issued written notice, to the attention of his financial adviser Mark Spitzer at McDonald Investments, that Sky Bank had been granted a security interest in the Stock Account; and Mr. Varner requested McDonald to sign and return to Sky Bank an attached Control Agreement and Acknowledgment of Pledge and Security Interest ("the Control Agreement").  It appears that Mr. Spitzer subsequently executed the Control Agreement and Acknowledgment as an "Authorized Signer" for McDonald

4

(5:09 CV 2468)

        Investments, but his signature is undated.  *See* ECF 1, Exhibit H.  However, since Mr. Spitzer signed the Control Agreement and Acknowledgment as Authorized Signer for McDonald Investments, the Court finds that he must have signed it prior to McDonald's merger with UBS in January of 2007.  *See* Item 7 below.

6.      December 7, 2005:

        Sky Bank filed a UCC Financing Statement covering collateral described as follows: "McDonald Financial Group Stock Acct. No. 88581850; whether any of the foregoing is owned now or acquired later; all additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)."  *See* ECF 1, Exhibit I.

7.      January- February 2007:

        McDonald was merged out of existence into UBS Financial Services Inc. ("UBS") (*See* ECF 1); the subject McDonald Stock Account and its proceeds were transferred to UBS; and UBS assigned a new account number to the Stock Account.  The total account value as of February 2007 was approximately $530,000.00.  *See* ECF 35-2 (Government Exhibit 2, UBS and McDonald account statements for February 2007).  Both the McDonald and the UBS account statements reflect that the Stock Account was titled as the "Richard Varner Collateral Loan Account."  Page 1 of the UBS statement contains the following "Account Instructions:"

        This account has been pledged to secure an obligation or is guaranteeing the obligations of another account. ****  Statement copies are sent to 1 interested party.

8.      July 10, 2007:

        The IRS recorded a Notice of Federal Tax Lien declaring an assessment of $658,919.59 against Mr. Varner for tax year 2002.  *See* ECF 30-1 at page 4 of 41 (Government Exhibit 2).

9.      September 21, 2007:

        Sky Bank was merged out of existence into The Huntington National Bank, Plaintiff herein.  *See* ECF 1, Exhibit A.

10.     January 17, 2008:

(5:09 CV 2468)

The IRS recorded a Notice of Federal Tax Lien declaring an assessment of $1,647,468.79 against Mr. and Mrs. Varner for tax year 2003.  *See* ECF 30-1 at page 7 of 41 (Government Exhibit 4). **[2]**

11.    January 29, 2008:

The IRS sent Mr. and Mrs. Varner a Notice of Intent to Levy in the amount of $1,728,986.57 for tax year 2003.  *See* ECF 30-1 at pages 8-9 of 41 (Government Exhibit 5).

12.    February 13, 2008:

Mr. Varner exercised his IRS administrative appeal rights by filing a Request for a Collection Due Process Hearing seeking withdrawal of the federal tax lien and proposed levy for tax year 2003, stating that "The lien should not have been filed.  All tax actually owed was paid before liens were filed," and explaining his reason for the request as follows:

> Tax assessments do not accurately reflect the true tax liability.
> The taxpayer's prior accountant intentionally inflated income to
> meet bank loan covenants.  The taxpayer has not had the
> opportunity to contest the amounts assessed and is in the process
> of recalculating 2003 tax and will file an amended return.

*See* ECF 30-1 at pages 10-11 of 41 (Government Exhibit 6).

13.    January 22, 2009:

Huntington obtained a state court cognovit judgment upon Note 2 for $763,494.77 plus interest at 18% running from August 27, 2008.  *See* ECF 1, Exhibit E.

14.    March 6, 2009:

Huntington filed a state court real property foreclosure action ("the Foreclosure Action") and named Mr. Varner, the United States, and others as defendants.

15.    March 23, 2009:

Approximately one year after Mr. Varner filed his Request for a Collection Due Process Hearing (*See* Item 12 above), the proposed Levy and Notice of Federal Tax Lien for tax

---

[2]  Mrs. Varner was subsequently granted innocent spouse relief.

6

(5:09 CV 2468)

year 2003 were sustained by the IRS Cleveland Appeals office. [3] *See* ECF 30-1 at pages 14-19 of 41 (Government Exhibit 7).

16.     July 17, 2009:

The IRS sent Mr. Varner the statutorily required advance notice of IRS levies declaring that, with additional penalties and interest having accrued, the amount due for tax year 2003 was now up to $1,795,876.35.  *See* ECF 30-1 at pages 20-21 of 41 (Government Exhibit 8).

17.     July 20, 2009:

The annual Hartford statement for the $3,000,000.00 Life Insurance Policy continued to declare the Policy Owner as "R VARNER REV TST 7/9/02 c/o RICK VARNER TTEE" and the Insured as RICK W VARNER; and declared the Policy's cash surrender value to be $181,425.67.  *See* ECF 35-1 (Government Exhibit 1).

18.     August 6, 2009:

The IRS issued notices of levy to UBS and Hartford showing an unpaid balance of assessment in the amount of $1,799,749.88 for tax year 2003.  Each Notice of Levy contained the following instructions:

> This levy requires you to turn over to us this person's property and rights to property . . . that you have or which you are already obligated to pay this person.
>
> Turn over any . . . money, property, credits, etc. that you have or are already obligated to pay the taxpayer, when you would have paid it if this person asked for payment.
>
> ****
>
> If you don't owe any money to the taxpayer, please complete the back of Part 3, and mail that part back to us in the enclosed envelope.

*See* ECF 30-1 at pages 22-23 of 41 (Government Exhibit 9).

_____

[3]  Apparently Mr. Varner never did file an amended return for 2003, and thus the Appeals Office sustained the amount of the tax assessment based upon the return as originally filed.  *See* ECF 30-1 at page 18 of 41.

7

(5:09 CV 2468)

19.    August to October 2009:

After the IRS issued the notices of levy to UBS and Hartford, Huntington amended its
state court complaint in the Foreclosure Action to seek to enjoin the IRS from collecting
on the levied assets, whereupon the IRS removed the case to federal court (*See* Case No.
5:09 CV 2122-DDD).  Huntington then dismissed the portion of its case seeking
injunctive relief against the IRS; and the foreclosure portion of the case was remanded to
state court (where it is apparently still pending).

20.    October 22, 2009:

Huntington filed the present wrongful levy action.

## II.  Analysis and Law

A.    <u>The Overall Posture of the Case</u>:

In its prayer for relief (*See* Complaint (ECF 1) at page 10), Huntington seeks, among

other things, an order of wrongful levy under 26 U.S.C. § 7426; an injunction to prohibit the

enforcement of the subject levies; and a declaratory judgment declaring the rights, duties, or

obligations with respect to the parties in the Stock Account and the Life Insurance Policy.  In the

meantime, Huntington seeks a preliminary injunction against the enforcement of the levies.

The injunction issue is governed by 26 U.S.C. § 7426(b)(1), which states:

If a levy or sale would irreparably injure rights in property which the court
determines to be superior to rights of the United States in such property, the court
may grant an injunction to prohibit the enforcement of such levy or to prohibit
such sale.

Huntington has conceded that in order to obtain injunctive relief, it must prove two

elements: (1) that the enforcement of the levies would irreparably injure Huntington's rights in

the levied property, and (2) that Huntington possesses rights superior to the rights of the United

States in the levied property.  The Court will address these elements separately.

8

(5:09 CV 2468)

    1.  <u>The Issue of Irreparable Injury to Rights in Property</u>:

Turning to the first element above, Huntington claims that the enforcement of the levies would irreparably injure Huntington's rights in the levied property.  Citing 26 U.S.C. § 7426(g), the IRS responds that no irreparable injury would result because, if Huntington ultimately prevails on the merits of its wrongful levy claim, Huntington would receive payment of the levied amount, plus interest, and therefore "will not be harmed at all"  by enforcement of the levies.  *See* ECF 35 at p. 4.

In other words, the Government claims that since mere money is at stake, Huntington cannot reasonably claim that irreparable harm would result from the denial of preliminary injunctive relief.  The Court disagrees.  As the Court has already noted in its Temporary Restraining Order entered October 30, 2009, any injury sustained by Huntington would be irreparable "since the funds or proceeds contained in the stock account and the life insurance policy must be removed, transferred, assigned, sold, disposed of and/or converted . . . ."  ECF 21 at p. 2.  By way of further explanation, it is not mere money at stake here, but rather the diminution in value of the security interests to Huntington.

For example, the Life Insurance Policy has a death benefit value of $3,000,000.00 and a cash surrender value of only about $180,000.00.  Thus Huntington may well decide to refrain from taking the cash surrender value now, in the hope that Mr. Varner will eventually repay at least some part of the loan, but if not, upon Mr. Varner's death Huntington would have a lien against the $3 million death value of the Policy and not merely the $180,000 cash value.  But if

9

(5:09 CV 2468)

the IRS were to levy upon the cash surrender value now, the Policy would become defunct and Huntington would be left with no security interest.

In the Court's view, the same analysis applies to the Stock Account.  It appears from the June 2009 UBS statement that essentially all the investments were liquidated with the result that the Stock Account now (or at least as of June 2009) consists entirely of cash.  But as the economy (hopefully) recovers, that cash could be prudently reinvested resulting in the Stock Account becoming worth significantly more than what it is worth now.  But if the IRS were to levy the cash at this point, there would be nothing left to be invested, and Huntington's security interest in the Stock Account would be worthless.

In summary, although the IRS claims that Huntington, if it ultimately prevails on the wrongful levy claim, will receive the levied amount plus interest and thus would be "paid in full from the U.S. Treasury," the underlying assets securing the Huntington loan would simply disappear.  Accordingly, the Court finds that a "levy or sale would irreparably injure rights in property" within the meaning of 26 U.S.C. § 7426(b)(2).

2.  The Issue of Superiority of Rights in Property:

Turning to the second element of § 7426(b)(2), whether Huntington has demonstrated that it has "rights in property which the court determines to be superior to rights of the United States in such property," the Court notes that this element goes to the ultimate issue in the case, *i.e.*, the wrongful levy issue. The Court recognizes that at this stage of the proceedings the Court cannot rule upon the merits but only upon the subject Motion for Preliminary Injunction. Nonetheless, the Court must address the ultimate issue due to the requirements of § 7426(b)(2)

10

(5:09 CV 2468)

quoted above, to wit: that a movant for injunction must demonstrate that it has "rights in property which the court determines to be superior to rights of the United States in such property."

To determine whether Huntington has "rights in property . . . superior to rights of the United States in such property," the Court must analyze separately the two assets levied upon: (1) the Stock Account, and (2) the Life Insurance Policy.

For the reasons set forth below, the Court determines that Huntington has rights superior to the rights of the United States in both the Stock Account and the Life Insurance Policy. Accordingly, the Court will sustain Huntington's Motion for Preliminary Injunction. The Court will now further address the two assets levied upon.

B.    The Stock Account:

The relative priorities of the IRS and Huntington as to the Stock Account must be determined by considering both federal and state law.  First, 26 U.S.C. §§ 6321 and 6322 provide that, upon a delinquent tax assessment, federal tax liens attach to all the taxpayer's property and rights to property, both property in existence at the time of the assessment, and property later acquired. *United States v. Safeco Ins. Co. of America,* 870 F.2d 338, 340 (6th Cir. 1989). Huntington does not dispute that the subject Stock Account is the property of taxpayer Mr. Varner.   Huntington claims, however, that it perfected a security interest in the Stock Account prior to July 10, 2007 when the first Notice of Federal Tax Lien was filed; and that therefore Huntington holds rights in the Stock Account that are superior to the federal tax liens against the Stock Account.  To determine whether Huntington achieved such priority, the Court must first

11

(5:09 CV 2468)

consider 26 U.S.C. §§ 6323(a) and 6323(h)(1), which provide that the holder of a security

interest can achieve priority over a federal tax lien if such holder perfects its security interest

prior to the filing of a Notice of Federal Tax Lien.

26 U.S.C. § 6323(h)(1) states in relevant part as follows:

> Security interest.  The term "security interest" means any interest in property
> acquired by contract for the purpose of securing payment or performance of an
> obligation . . . .  A security interest exists at any time (A) if, at such time, the
> property is in existence and the interest has become protected under local law
> against a subsequent judgment lien arising out of an unsecured obligation . . . .

The parties do not dispute that Huntington's interest in the Stock Account is a "security

interest."  Rather, the disputed issues are (1) whether the "property" (in which the security

interest was acquired) was "in existence" prior to July 10, 2007; and (2) whether the security

interest became "protected under local law" (*i.e.,* whether it was perfected) prior to July 10,

2007.

As to the first issue, the IRS claims that, even if Huntington perfected a security interest

in the Stock Account prior to July 10, 2007, the IRS has priority over stock acquired after that

date "because the liens of the IRS and Huntington in that stock arose simultaneously upon

purchase (Huntington could not have a security interest in property that did not yet exist)."  *See*

ECF 30 at p. 11.  The Court disagrees.  Ohio Rev. Code § 1309.106(C) provides that a "secured

party having control of all security entitlements . . . carried in a securities account . . . has control

over the securities account . . . ."  Because Huntington had control of all security entitlements in

the Stock Account (*See* discussion below), the Court concludes that Huntington had (and

12

(5:09 CV 2468)

continues to have) control over the Stock Account – regardless of any trading that occurred after July 10, 2007.

The Court turns now to the question of whether Huntington's security interest in the Stock Account became "protected under local law against a subsequent judgment lien arising out of an unsecured obligation" prior to July 10, 2007.  In other words, was Huntington's interest perfected under state law prior to July 10, 2007?  The Court concludes that it was.

Ohio Revised Code Chapter 1309 governs the method of perfection of Huntington's security interest in the Stock Account.  First, Ohio Rev. Code § 1309.102(49) defines a securities account (*i.e.,* a stock account) as "investment property."  The preferred method for perfecting an interest in "investment property" is not to file a UCC Financing Statement but rather to obtain control of the property. [4]  As explained in Official Comment 4 to Ohio Rev. Code § 1309.312:

> A security interest perfected only by filing is subordinate to a conflicting security interest perfected by control or delivery. **** Thus, although filing is a permissible method of perfection, a secured party who perfects by filing takes the risk that the debtor has granted or will grant a security interest in the same collateral to another party who obtains control.

To obtain control over investment property held through an intermediary (*i.e.,* an investment company such as McDonald or UBS), Ohio Rev. Code § 1309.106(B)(2) provides that the customer (debtor), the secured party, and the intermediary must all agree that the secured

---

[4]  The IRS has advanced the argument that the UCC Financing Statement, which was filed by Huntington's predecessor on December 7, 2005, does not provide a sufficient description of the Stock Account collateral since it refers to the "McDonald Financial Group Stock Account 8858XXXX" and since UBS subsequently changed the account number of the Stock Account following the merger of McDonald Investments into UBS.  However, the Court need not decide that issue. Since Huntington perfected its interest in the Stock Account by the preferred method of obtaining control over the Account, its filing of a UCC Financing Statement was superfluous.

13

(5:09 CV 2468)

party will have exclusive control over all entitlements to proceeds of the investment property.

Ohio Rev. Code § 1309.106, at Official Comment 4 thereto, describes the type of agreement that

will be sufficient to obtain control under § 1309.312:

> Of course, an agreement that provides that (without further consent of the debtor)
> the securities intermediary or commodity intermediary will honor instructions
> from the secured party concerning a securities account or commodity account
> described as such is sufficient.  Such an agreement necessarily implies that the
> intermediary will honor instructions concerning all security entitlements or
> commodity contracts carried in the account and thus affords the secured party
> control of all the security entitlements or commodity contracts.

As to when perfection by control takes place, Ohio Rev. Code § 1309.314(C)(1) provides

that a security interest in investment property is perfected by control "from the time the secured

party obtains control;" and Official Comment 3 to § 1309.314 states, "Once a secured party has

control, its security interest remains perfected by control until the secured party ceases to have

control and the debtor receives possession of the collateral."

In the present case, the Court finds that Huntington obtained control of the Stock

Account, and thus perfected its interest in the Stock Account, prior to July 10, 2007.  *See* Factual

Background above at ¶ 5.  Further, and contrary to the Government's position, the Court finds

that Huntington did not cease to have control when McDonald Investments was merged into

UBS.  There is no dispute that UBS is the successor in interest to McDonald Investments and

that the Stock Account was transferred to UBS; no dispute that UBS continued to maintain the

Account as a collateral loan account; and no dispute that Mr. Varner continued to have no right

to withdraw funds from the Stock Account.  The Court therefore concludes that Huntington's

rights in the Stock Account are superior to the rights of the United States in the Stock Account.

14

(5:09 CV 2468)

C.       The Life Insurance Issue:

The parties dispute three points as to whether levy was wrongfully issued against the cash surrender value of the Life Insurance Policy:

1.   Huntington claims it perfected a prior security interest in the Policy by filing the UCC Financing Statement (ECF 1, Exhibit I) that also secured the Stock Account.

2.   Huntington claims the Taxpayer Mr. Varner does not own the Policy; but that his Trust owns it.  The IRS responds that the Taxpayer Mr. Varner owns the Policy because the subject Trust is merely the *alter ego* of the Taxpayer.

3.   Huntington claims that, regardless of whether the Taxpayer owns the Policy, the Policy was "absolutely" assigned to Huntington before the first Notice of Federal Tax Lien was filed on July 10, 2007.  The IRS claims the subject assignment was not "absolute" and is therefore insufficient to prime the tax lien.

Turning to the first point above, it appears that one cannot perfect a security interest in a life insurance policy by filing a UCC Financing Statement, since Article 9 of the UCC simply does not apply to life insurance policies such as the Policy in this case.  *See* Ohio Rev. Code § 1309.109(D)(8).  In addition, the Policy was not held in the Stock Account covered by the UCC Financing Statement.  *See* Factual Background above at ¶ 6.  The Court thus concludes that Huntington did not perfect a prior security interest in the Policy by filing the UCC Financing Statement that also secured the Stock Account.

Turning to the second point above as to "Who owns the Policy?," the Court's analysis begins with some basic trust law principles.  As a threshold matter, a trust, as such, does not

15

(5:09 CV 2468)

"own" property.  It is the *trustee* of a trust who holds title to the trust assets.  Presumably Richard Varner is the Trustee of the Trust at issue, since he executed the Assignment to Huntington's predecessor in his capacity as Trustee.  *See* ECF 1 at Exhibit F, page 2; Factual Background above at ¶ 2(b).  The Court assumes, therefore, that what Huntington actually means to say is that Richard Varner, *in his capacity as Trustee of the subject Trust,* owns the Trust assets including the Life Insurance Policy.  Also presumably, the Trust is revocable since it is titled as the "Richard Varner Revocable Trust Dated 07/09/02."  But the Court cannot determine the Trust ownership issue with any certainty because the Court has not been provided with a copy of the Trust instrument.  Thus the Court is left with unanswered questions that are critical to the Court's analysis of the Government's position that the Taxpayer owns the Policy because the Taxpayer's Trust is merely the *alter ego* of the Taxpayer.  For example:

1.  Who is the Grantor of the Trust?  Is it the Taxpayer Mr. Varner or is it someone else?

2.  Does the Grantor in fact have the power to revoke the Trust?  In other words, is the power to revoke actually set forth in the body of the Trust instrument and not merely in the title of the Trust?

If the Grantor has the power to revoke the Trust, and if the Grantor is also the Taxpayer, then the Trust is unquestionably the *alter ego* of the Taxpayer for IRS purposes; and the Taxpayer Mr. Varner must be deemed to "own" the Trust assets including the Life Insurance Policy.  But although the record is insufficient to permit the Court to resolve this *alter ego* ownership issue, the Court concludes that the issue is not dispositive of the ultimate issue of

16

(5:09 CV 2468)

whether Huntington's rights in the Policy are superior to the rights of the United States in the Policy.

Turning to the third point above, regardless of whether the Taxpayer "owns" the Policy, the question is whether the Policy was assigned in a manner sufficient to prime the federal tax liens.  The Court concludes that it was.

Both Huntington and the IRS cite Ohio Rev. Code § 3911.10 as the only statute that is possibly relevant to the issue of whether the assignment of a life insurance policy can protect the interest of the assignee from the claims of creditors.  And the parties do not dispute that § 3911.10 requires an "absolute assignment" to be effective.  The Court finds that the subject Assignment was not "absolute" but was instead the mere assignment of a security interest in the Policy as collateral for loans received.  *See* Factual Background above at ¶ 2(b).  However, the Court concludes that Section 3911.10 does not apply here.

Section 3911.10 states in relevant part:

> ***All contracts of life . . . insurance*** . . . upon the life of any person, or any interest therein, which may hereafter mature and ***which have been taken out for the benefit of . . . or assignment to . . . any creditor*** . . . shall be held, together with the proceeds or avails of such contracts . . . free from all claims of the creditors of such insured person . . . .  (emphasis added).

In the present case, it does not appear as though the Life Insurance Policy was "taken out for the benefit of or assignment to any creditor."  The Policy was issued on July 19, 2002, and it was not assigned to a "creditor" (*i.e.,* Huntington's predecessor) until Note 1 was executed on April 25, 2003.  *See* Factual Background above at ¶¶ 1 and 2.  The Court thus concludes that Section 3911.10 has no application to the facts of this case.

17

(5:09 CV 2468)

Although the Court finds that Section 3911.10 does not apply to the facts in this case, the Court must still determine whether the 2003 Assignment of the Policy was sufficient to prime the federal tax liens. Based upon the very language contained in the IRS notice of levy form issued to Hartford, the Court concludes that it was. As noted above in Factual Background at ¶ 18, the IRS's notices of levy to UBS and Hartford contain the following instructions:

> This levy requires you to turn over to us ***this person's property and rights to property . . . that you have or which you are already obligated to pay this person.***

> Turn over any . . . money, property, credits, etc. ***that you have or are already obligated to pay the taxpayer, when you would have paid it if this person asked for payment.***

> **** 

> If you don't owe any money to the taxpayer, please complete the back of Part 3, and mail that part back to us in the enclosed envelope.

*See* ECF 30-1 at pages 22-23 of 41 (Government Exhibit 9) (emphasis added).

Now since the Policy at issue was collaterally assigned in 2003, so that the Lender had the sole right to collect the proceeds upon the death of the insured and the sole right to surrender the Policy, it does not appear that Hartford was (to use the IRS phrase) "obligated to pay the taxpayer" the cash surrender value of the Policy, even if Mr. Varner had asked for such payment. It therefore appears from the Government's own notice of levy form that Hartford was not required to turn over the cash value of the Policy to the IRS. The Court thus concludes that Huntington's rights in the Policy are superior to the rights of the United States in the Policy.

18

(5:09 CV 2468)

## III.  Conclusion

For the reasons set forth above, it is hereby ordered that The Huntington National Bank's Motion for Preliminary Injunction (ECF 3) is sustained pursuant to 26 U.S.C. § 7426(b). Pending the Court's final decision on the priority of the federal tax liens at issue in this case, the defendant United States of America is prohibited from enforcing any levy, and from selling or transferring any property, relative to (i) a certain stock investment account known as the Richard Varner Collateral Loan Account ("Stock Account") maintained by the defendant UBS Financial Services, Inc. ("UBS"), and (ii) a certain life insurance policy insuring the life of Rick W. Varner ("Life Insurance Policy") maintained by the defendant The Hartford Life Insurance Company ("Hartford").

IT IS SO ORDERED.


_____April 6, 2010_____          ___*s/ David D. Dowd, Jr.*_____
Date                                 David D. Dowd, Jr.
                                     U.S. District Judge

19